## THE TERRITORY V. BANNIGAN.

*1. MURDER:* INDICTMENT: SUFFICIENCY. An indictment for murder in the common law form charging the crime to have been committed " wilfully, feloniously and with malice aforethought," is sufficient under the statute without an allegation of " premeditated design to effect the death of the person killed."

*2.* ——: ——: ——. Murder under the statute not being divided into degrees, and the statutory definition including, in the different subdivisions, both express and implied malice; and malice aforethought, as it has for so long time been construed and come to be understood, embracing both, they are the most apt and appropriate words to be used by the pleader in charging the crime.

*3. INDICTMENT:* STATUTORY WORDS. The rule that the indictment should bring the offense within the words of the statute declaring it, held applicable in its strict terms to cases where the offense is created by statute; or where the punishment has been increased and the pleader seeks to bring the prisoner within the enhanced punishment; or where new ingredients have been added, either limiting or enlarging the original constituent elements of the crime.

*4. MANSLAUGHTER:* PREMEDITATION: PASSION AND PROVOCATION. While the statute defines homicide to be manslaughter when perpetrated without a design to effect death, still if it was perpetrated in the heat of passion engendered by a sudden and sufficient provocation, even though the accused at the instant, and in his frenzy, intended to take life, the law will interpose and say there was no intent, no premeditated design such as is essential to constitute murder.

*5.* ——: PROVOCATION: COOLING TIME. No precise or definite rule can be laid down as to the time within which the blood should cool; each case must be governed by its own circumstances, the character and temperament of the man, the nature of the provocation, etc. *Quere:*—That the question, what is a sufficient cooling time? and the question, what is a sufficient provocation? are both of law, not of fact.

6. *INSTRUCTIONS:* DUTY OF JUDGE. It is the duty of the Judge to give full instructions covering the entire law of the case, as respects all the facts proved or claimed by the respective counsel to be proved; but if he omits anything, and is not asked to supply the defect, the party remaining silent cannot complain.

7. ———: REASONABLE DOUBT: DEGREE OF CERTAINTY. An instruction in which the jury is charged that " in determining the question of doubt, you will act as a prudent, careful business man would act in determining an important matter pertaining to his own affairs," *held:* erroneous. There must be in the mind of the juror an abiding conviction to a moral certainty of the truth of the charge. And that conviction must be such as would lead him to venture to act upon it, in matters of the *highest concern and importance* to his own interest.

### *Writ of Error to the Burleigh County District Court.*

On the 24th day of February, 1877, the defendant, Peter Bannigan, was indicted in the District Court of Burleigh County for the crime of murder, in killing one John D. Massingale, alleged to have been committed " wilfully, feloniously, and with malice aforethought."

On this indictment the defendant was tried and a verdict of "guilty of murder as charged in the indictment" found by the jury. Motions in arrest of judgment and for a new trial were entered and overruled, and the defendant sentenced to death. Numerous exceptions were taken during the progress of the trial, which the defendant has, by his writ of error, brought to this court for review, and which are stated in the opinion.

*Erwin & Griffin,* for plaintiff in error.

"This Court has several times granted a new trial when, as it appeared to us, the defendants application to put off his trial should have been granted." (*The People v. Vermilyea,* 7 Cow., 385.) A new trial was granted where the Court below "thought the affidavit too loose in merely stating information and belief of the witness's removal."

In the case of *Hooker v. Rogers,* 6 Cow., 577, the witness was unable to attend, "and this we held sufficient cause for putting off the trial."

In the matter of refusing a continuance, "the inquiry always is, 'has injustice been done?' 'Has the party been injured?'"

(2 Grah. & Wat. New Trials, 699 and 700; *Ogden v. Gibbons*, 2 Southard's R., 518.)

The accused sometimes has just reasons to complain of oppressive ruling on the part of the Court, in this particular. But the Court will not fail to make proper amends by granting a new trial in every case where it appears that the prisoner has in this way been deprived of a fair opportunity to make his defense. (2 Grah. & Wat. New Trials, 700.)

The majority of the criminal laws will be best maintained and vindicated by giving to each offender a fair and reasonable time to make his defence, and not by forcing him into a trial with indecent haste, when his body and mind, from his unfortunate condition, cannot be supposed calculated to arrange and prepare his defence, either with judgment or discretion. (2 Grah. & Wat. New Trials, 703.)

(1st Greenleaf Ev., sec. 442 Roscoe's Crim. Ev., p. 103.) This man Hood was a soldier; his former testimony is fully corroborated by other evidence in the case. He was, at the hour of his giving testimony, under charges for felony; his captain had tampered with him, his explanation is forced and exhibits such natural characteristics as compel the State to accept his original testimony, after the cross-examination and the re-direct examination. The dramatic effect of his false correction carried the verdict. (Code of Criminal Procedure, § 354.

" Murder in the first degree, is a *wilful, deliberate,* and *premeditated* killing. We find that by the omission of the word ' deliberate,' no other word being used capable of conveying the same idea, the indictment fails to describe the crime of murder in the first degree. The indictment being thus defective, the defendant could not have been tried for murder in the first degree." (*State vs. Boyle*, 28 Ia., 525.)

" As already observed, it appears to be everywhere admitted now, that if this form of the allegation does not contain in some way this higher charge," (deliberately premeditated) "it is contrary to our constitutions, to convict a prisoner upon it, as for murder in the first degree, though a statute should so expressly direct." (2 Bishop Crim. Pro., 587, 598, 588, 589, 2d ed. § 587.)

The indictment must set out, that the killing was wilful and *deliberate*, or otherwise designate the element of crime which the statute makes essential to this degree of the offense. (2 Bishop Crim. Pro., 603 (2 ed.) 592; *State v. McCormick*, 27 Iowa, 402; 27 id., 415; *State v. Boyle*, 28 id. 522; *State v. Knouse*, 29 id. 118; *Fouts v. State*, 8 O. St., 98; *Kain v. State*, 8 O. St., 306; *Hagan v. State*, 10 O. St., 459; *Fouts v. State*, 4 Green, Ia., 500; *Bower v. State*, 5 Mo., 364; *State v. Jones*, 20 Mo., 58; *Johnson v. Comm.*, 24 Pa. St. R., 386; *State v. Reakey*, 62 Mo., 40.)

No legal person of any sort has undertaken to answer the view of legal doctrines thus presented. No one who understands them ever will. (2 Bishop Crim. Pro., 607; Form of Indict., 2 Bishop Crim. Pro., 591, 2d ed.)

In Pennsylvania, and other states which have followed its line of decisions, holding that it is not necessary for the indictment to designate the grade of homicide, and that the common law indictment for murder is sufficient in all cases of murder in the first degree, our conclusion is that these cases are of doubtful soundness on principle; but however this may be in those states, the question is different here, where we have no common law crimes, and where even murder is statutory. *State v. McCormick*, 27 Ia., 402; *State v. Thompson*, 31 id., 393.)

"Although a different practice has prevailed in Pennsylvania, New York and Tennessee, we consider it safest to follow the practice which has prevailed so long in our own State." (*State v. Jones*, 20 Mo., 61.)

The instruction given by the Court, that the jury must exercise the same precaution as they would in ordinary business transactions, is error. It should be as in matters of highest concern and importance. (*State v. Dineen*, 10 Minn., 407; 1 Greenleaf Ev., 2; *People v. Brannon*, 47 Cal., 96; 2 Green Crim. R., 435 and note; *Jane v. Com.*, 2 Met., (Ky.) 33; *Giles v. State*, 6 Ga., 285; *State v. Ostrander*, 18 Ia., 458; 1 Bishop Crim. Pro., 1052.

A reasonable doubt as to the effect of the erroneous charge will be sufficient to avoid the verdict. (1 Grah. & Wat. New Trials, 270; *Wardel v. Hughes & Moore*, 3 Wend., 418.)

A new trial must be ordered whenever it is necessary, as a matter of right. (3 Estees' Pleadings and Forms, p. 754.) It is error to refuse a new trial when justice requires it. (*Ross v. Austill*, 2 Cal., 183.) Even on principle, there are cases in which a discretionary power might be exercised in favor of defendants, granting them a new trial where they could not strictly claim rights. (1 Bishop Crim. Law, 847.) Humane principles would require that, after a conviction, a prisoner should be indulged with another opportunity to save his life, if anything had occurred upon the trial which rendered doubtful the justice or legality of his conviction. (*Com. v. Green*, 17 Mass., 534.) It is discretionary with the courts to grant new trials, where there has been no error on the trial. (*Com. v. Green*, 17 Mass., 550.)

*G. C. Moody*, for the Territory.

No copy of the affidavit for a continuance is set out in the printed record, and the substance is given differently in different parts of the record, but at the best the reasons given are clearly insufficient to compel a continuance.

The granting or refusal of the motion was largely in the discretion of the Court, and in this case the record shows the discretion to have been wisely exercised, as there were several witnesses produced to the transaction, and some by defendant in his own behalf. (Wharton's Crim. Law, vol. 3, 3020, &c.)

The Court was the trier and sole judge of the *facts* upon the challenge of the juror Driscoll, and decided properly. ‖

No objection or suggestion as to the order of challenge was made by the defendant, and it is difficult to see how he could be possibly prejudiced by the neglect to follow the order in any event. The statute is merely directory. (22 N. Y., 150, *Sanchez v. People.*)

The neglect to read the indictment or to state the plea forms no ground for a new trial. The causes for a new trial are limited by the statute and this is not found among them. (Revised Criminal Code, § 423.)

The attention of the court was not called to it. No substantial rights of the prisoner were prejudiced. The jury must have been informed of the issues they were to try, and that is the sole object of the reading of such indictment and statement of the plea, and as we do not find such neglect among either of the causes for a new trial or arrest of judgment, the statute must be held to be only directory, at the least, unless the defendant had seasonably demanded it and it had been refused by the Court.

The re-examination of the witness Hood was in no sense an impeachment of him. He was examined by the defense upon a matter not brought out by the prosecution, and was again brought back upon the witness stand to correct an error of statement made by him upon such examination by the defense. This does not come within the rule laid down by Greenleaf and other authorities. (Greenleaf's Ev. § 442, 443, 444, 445, a and notes; *Sanchez v. People*, 22, N. Y. 147.) Nor do I see any objection or exception noted in the bill of exceptions, although it is recited as a fact in the motion for a new trial and arrest of judgment and in the petition in error that such objection was made and exception taken.

The indictment is a sufficient indictment for murder at common law, and is therefore sufficient under our statute. (*People v. Enoch*, 13 Wend., p. 159; *Fitzgerrold v. People*, 37 N. Y. p. 413.) Our statute does not divide murder into degrees as in the States, from whence the counsel for defendant draw their authorities, and therefore the reasoning of those authorities does not apply. Surely "with malice aforethought," must mean "with a premeditated design," or with some design. And manslaughter in the 1st degree is defined to be a killing *without a design* to effect death, except when perpetrated unnecessarily in resisting an attempt to commit a crime or after such attempt has failed. This then charges murder or it charges no felonious homicide at all.

The record is not at all satisfactory as to the charges given and refused, requested by the defendant, and it is not easy therefrom to tell precisely or substantially what requests were made by defendant or what of such requests were given and

what refused, but it seems to me the instruction by the Court upon its own motion, which is objected to, will not bear the construction put thereon by defendant's counsel, and is clearly right. First, the Court tells the jury that they must bear in their minds the principles of law, that the prosecution has the affirmative of the issues and must satisfy the jury not only by a preponderance of the testimony, but beyond a reasonable doubt, of the defendant's guilt, before they can convict him, and then in determining and resolving that question of doubt, (not in determining the defendant's guilt or innocence,) they are to act with prudence, and care and prudently and carefully as a business man would act in determining an important matter of his own. And then the Court immediately follows this by telling the jury that to authorize a conviction, the evidence must not only be consistent with the idea and theory of the defendant's guilt, but must absolutely exclude *any* theory of his innocence. Surely this could not be claimed to be prejudicial to the defendant or calculated to mislead them against the prisoner. No rule is better settled than that it is not allowable to take a single sentence of a judge's charge and isolate it from the rest of the charge upon the same point or subject, and allege that as error. The whole of the instruction upon the same subject must be taken and construed together, because it is the whole when taken together that is supposed to produce the impression.

Upon the appeal to the discretion of this Court made by the able counsel for the prisoner, I have only to reply that a careful examination of the record as exhibited to this Court has satisfied me that there was evidence which would have justified the jury in finding a lesser degree of crime, and there is enough to support the present verdict. It can hardly be claimed that it is apparent from an inspection of the record that a preponderance of the evidence is against this verdict and unless it can be so determined, it is not the province of this Court to disturb it.

BENNETT, J.—We have in the record before us, in form, a common law indictment for murder, with a verdict of guilty as charged, and judgment of death.   Is this indictment sufficient, under our statute, to sustain this verdict and judgment? Counsel for defendant insist that it is not, and that it charges only manslaughter in the first degree, for the reason that it does not charge, *in haec verba,* the homicide to have been perpetrated "with a premeditated design to effect the death of the person killed."   Murder, as defined by the common law is "when a person of sound memory and discretion, unlawfully killeth any reasonable creature in being, and under the King's peace, with malice aforethought, either express or implied."   Our statute (§ 242 Penal Code) defines murder as follows:

1. . "When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed or of any other human being.

2.   When perpetrated by any act imminently dangerous to others, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual.

3.   When perpetrated without any design to effect death by a person engaged in the commission of any felony."

It will be observed that the words "with malice aforethought" are not employed in our statutory definition, and that a criminal homicide may rise to the higher degree of murder, though wanting in the element of premeditated design.   What ingredient, if any, has our statute added to, or eliminated from the crime of murder as it existed at the common law?  If no ingredient has been added, and the crime remains substantially the same, though the phraseology used by our statute in defining it may be different, then this indictment must be held good.

The rule contended for by counsel for defendant, that the indictment should bring the offense within the words of the statutes declaring it, is applicable only in its strict terms to cases where the offense is created by the statute, or where the punishment has been increased, and the plea-

der seeks to bring the prisoner within the enhanced punishment, or where new ingredients have been added either limiting or enlarging the original constituent elements of the crime. But admitting the strictest construction of the rule, our statute provides that the " words used in a statute to define a public offense need not be strictly pursued in the indictment; but other words conveying the same meaning may be used," (§ 221, Crim. Proc.)

Homicide, as we have seen, was at common law, murder when perpetrated with malice aforethought, express or implied. Express malice has no uncertain legal meaning, and is defined when used with reference to homicide, to be "when one with a sedate, deliberate mind, and formed purpose, doth kill another." The legislature of this Territory sought to popularize, so to speak, legal phraseology in framing the provisions of our Penal Code, and to make them plain to the common understanding of the citizen, who is presumed to know their meaning. And with this purpose in view, in drafting the first subdivision of the section referred to, instead of the phrase " with malice aforethought " or " express malice," the language of the best definition of these phrases, conveying their meaning and import is employed: " with a premeditated design to effect the death, &c." But this change in phraseology was deemed necessary from another consideration, which is forcibly stated by Judge Nelson in the case of *The People v. Enoch*, 13 Wend. 159, a case that arose under a statute of which ours is an exact copy. (2 R. S. New York, 657, § 5.) That learned judge uses this language: "Malice aforethought in common parlance, and as originally used, conveyed only the idea of express malice. Its meaning had been enlarged so as to include implied malice, by judicial construction, to define and limit which, was the object and has been the only effect of the fifth section above referred to." Under this judicial construction, malice aforethought, had been made to include both express and implied malice, and would be applicable to the definition of murder as set forth in all three of the subdivisions of section 242 Penal Code; but the first subdivision was, as declared by the supreme court of New York, intended to define murder in case of express malice, and the

second and third subdivisions in cases of implied malice; and this is in general the line of distinction drawn and observed by the statutes which divide murder into two degrees. Murder under our statute not being divided into degrees, and our statutory definition including in the different subdivisions both express and implied malice, and malice aforethought, as it has for so long time been construed and come to be understood, embracing both, they are the most apt and appropriate words to be used by the pleader in charging the crime. If the indictment charge, in the language of the first subdivision, the homicide to have been perpetrated with a premeditated design to effect death, the premeditated design, or express malice, must be proved. (*The People v. White*, 24 Wend. 520.) And from this it would seem to follow, that in such a case the defendant could not be convicted on evidence of implied malice, though coming clearly within the provisions of the second or third subdivision.

It is true that at common law malice aforethought had a broader signification than it will bear when applied to murder as defined by our statute. Formerly the prisoner might have been convicted upon proof of implied malice, which, under our statute would only amount to manslaughter, where for instance the accused, while engaged in an unlawful act under the degree of felony, killed another against his intention. But this cannot prejudice or jeopardize the rights of the accused, for, in the language of Judge Nelson in the opinion above referred to, "it is the business and duty of the court to see that a proper direction be given to the jury, in point of law, upon the evidence, and if either court or jury err, the appropriate remedy must be sought."

In the case of *The People v. Enoch*, supra, the chancellor uses this language: "From this examination of the subject, I have arrived at the conclusion that a common law indictment for murder is proper under the provisions of the Revised Statutes, and a defendant cannot be convicted on such an indictment, of a felonious homicide with malice aforethought, unless the evidence is such as to bring the case within the statutory definition of murder." And in the case of

*The People v. Clark*, 3 Seld., 385, (under the same statute) Johnson, J., holds that " the words ' premeditated ', ' afore-thought ', and ' prepense ' possess, etymologically, the same meaning; they are, in truth, the Latin and Saxon synonyms, expressing a single idea, and possess in law precisely the same force. The statute, so far as this term is concerned, has not altered the law."

The court of appeals, in the case of *Fitzgerrold v. The People*, 37 N. Y., 413, decided in 1868, after a careful review of the cases of *The People v. Enoch*, *The People v. White*, and *The People v. Clark*, supra, sustain and re-affirm the doctrine that a common law indictment, charging the offense of murder to have been committed "willfully, and of malice aforethought," is sufficient under the statute. And in the case of *Kennedy v. The People* 39 N. Y., 245, the same court held that " an indict-ment for murder, in the common law form, charging the kill-ing with malice aforethought, is good, notwithstanding our statute has divided the crime of murder into different degrees."

And the doctrine is further laid down in that case that "the statute is not a rule of pleading, but a guide to the conduct of the trial, prescribing the proofs requisite to a conviction."

That a common law indictment for murder, under the stat-utes of New York, even since the crime has been divided into degrees, is sufficient, may be considered the settled doctrine of that state.

In California, murder is divided into two degrees, and de-fined as follows: "All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpe-trate any arson, rape, robbery or burglary, shall be deemed murder in the first degree, and all other kinds of murder shall be deemed murder in the second degree." Under this statute the supreme court of that State has uniformly held an indict-ment in the common law form sufficient, charging the offense to have been committed with " malice aforethought." (*The People v. Lloyd*, 9 Cal. 55. *The People v. Dolan*, id. 576. *The People v. Cronin*, 34 Cal. 191. *The People v. Martin*, 47 Cal.

101.) The force of these authorities is not weakened, by the consideration that the specific definition of the degrees, is preceded by the general common law definition of the crime in the California statute. Our statute says " homicide is *murder* in the following cases." The question recurs, what is *murder* as here used ? Being a word defined by law, it must be construed according to its legal meaning. (§ 220. Crim. Proc.) Therefore supplying the definition, or all that is implied in the single word, and we have in general arrangement the California statute, without the division into degrees.

In the State of Pennsylvania, where murder in the first degree is defined to be " by means of poison or lying in wait, or in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, or by any other kind of willful, deliberate and premeditated killing," the indictment in common law form, charging the offense to have been committed with " malice aforethought," has always, " without variableness or shadow of turning," been held sufficient.

The contrary doctrine has been held by the supreme courts of Ohio (*Fouts v. The State*, 8 Ohio St. 98 ) and Iowa (*The State v. McCormick*, .27 Iowa 402,) and insisted upon in a few dissenting opinions. (Bacon, J. in *Fitzgerrold v. The People*, 37 N. Y. 685, and Dixon, C. J. in *Hogan v. The State*. 30 Wis. 442.)

Wharton, in his work on Criminal Law, Vol. 2, § 1115 says: " According to the great weight of authority, a common law indictment for murder is sufficient to support, under the statutes, murder either in the first or second degree," citing in support of the proposition a long array of authorities, not necessary here to refer to.

But it seems unnecessary to pursue the inquiry further. We have not been referred to one single authority, holding a common law indictment insufficient under a statute that leaves murder as at the common law undivided into degrees.

Bishop, who maintains the doctrine laid down in the cases of *Fouts v. The State*, and *The State v. McCormick*, *supra*, in his work on Criminal Procedure, (Vol. 2. § 586) uses the following language: " The result is, that, according alike to the

principles of the common law, to those principles of natural reason and justice which are inherent in the case, and to the provisions of State and national Constitutions, the indict- ment for murder, *where the statute divides it into two degrees,* should, if murder of the first degree is meant to be proved against the prisoner, contain those allegations which show the offense to be in this degree, * * * If murder in the second degree only is to be proved, then in all cases, an indictment for murder, drawn in any of the common law forms, will be adequate. *Thus it is with the two degrees of felonious homicide which we now call murder and manslaughter.*" The only de- grees known to our statute.

From these considerations we are clearly of the opinion, and so hold, that the indictment in this case is sufficient. We have no disposition nor wish to abandon the well trodden highways of judicial construction, along which, for so many cycles, have been heard the foot-falls of genius, for the ob- scure and intricate bridle paths, blazed out by a few bold and daring adventurers, who seem to be in search of scenery rather than safety, and who prefer the mists of speculation to the sunlight on the mountain tops of experience. Nor are we anxious to create for the opinions of this court a species of cheap notoriety, by arraying ourselves against the best legal thought of the past and present, in overturning prin- ciples and precedents, sanctioned alike by reason and com- mon sense, and which have received the support and enlightened judgments of the brightest and clearest intel- lects that have ever adorned the bench or guided the author's pen.

The mere love of novelty or the vain ambition to be con- sidered original do not furnish a sufficient apology for departing from the well settled forms and principles of pleading and procedure in criminal cases, when such de- parture is not made necessary by some legislative enactment, or dictated by sound considerations effecting the better ad- ministration of justice.

Certainty and stability in the rules governing judicial proceedings should never be sacrificed to hypercritical nicety

in phraseology or pedantic finessing in the use of words. *Stare decisis* is a maxim founded in wisdom, and when intelligently applied and adhered to with a sound discretion will "frae monie a blunder free us, and foolish notion."

On the trial the Judge gave to the jury the following instruction: "The prosecution has the laboring oar, or the affirmative of the issues, and must satisfy you, not only by a preponderance of testimony, but beyond a reasonable doubt of defendant's guilt. By doubt I do not mean that you must be satisfied beyond the possibility of a doubt, but in determining this question of doubt you will act as a prudent, careful business man would act in determining an important matter pertaining to his own affairs."

The latter part of this instruction is assigned as error. It is insisted by counsel for the prosecution that this instruction does not direct the jury that in determining the question of defendant's *guilt*, they are to "act as a prudent, careful business man would act in determining an important matter pertaining to his own affairs," but only in *resolving* the question of doubt.

The provision of our statute (§ 349, Crim. Proc.,) that " a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to be acquitted," is but the assertion of the well recognized common law principle, and gives to defendant the benefit of every reasonable doubt. And no view or consideration by the jury of the facts and circumstances in evidence, in arriving at a conclusion as to the guilt of the defendant, and in which the primary and essential element of reasonable doubt is ignored, can receive the sanction of the law.

It is, therefore, of the gravest importance that on this point the jury should receive proper direction, that the rights of the defendant may not be abridged nor the wise and wholesome rules relaxed, by which the legal certainty of his guilt is established.

What does the Judge mean when saying, " in *determining* this question of doubt?" We must admit that the pro po-

sition is not altogether free from perplexity. But does not the *determination* of necessity involve the *character* of the doubt ?.and on this point the Judge intimates but one qualification, and that is, it must not be a *possible* doubt, which in law is understood to be excluded by the word *reasonable*, previously employed in the charge. The import of the instruction and the sense in which we may reasonably presume it to have been understood by the jury, is, that they should be satisfied beyond a reasonable doubt of defendant's guilt, and in determining the character of that doubt, and its application to the evidence in the case, they should act as a prudent, careful business man would act in determining an important matter pertaining to his own affairs. And in this light the instruction is clearly erroneous.

Had the Judge told the jury, " that in determining the question of *defendant's guilt*, you will act as a prudent, careful business man would act in determining an important matter pertaining to his own affairs," we apprehend counsel for the prosecution would not for a moment insist upon its correctness. But the determination of the question of guilt is reached through a proper understanding of all the facts and circumstances in evidence, properly weighed and understood in the light of the law applicable, and if a mistake is made in any of the intermediate steps taken, the probabilities are that an erroneous result may be attained. The ultimate question of guilt may turn on the very point of *reasonable doubt*, and consequently " in determining this question of doubt "— to use the language of the Judge—the jury are determining the very question in issue, to-wit: the defendant's guilt.

On this point Greenleaf, in his work on Evidence (Vol. 1, § 2,) lays down the doctrine as follows: " By *satisfactory evidence*, which is sometimes called *sufficient* evidence, is intended that amount of proof, which ordinarily satisfies an unprejudiced mind, beyond reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined; the only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a com-

mon man; and so to convince him that he would venture to act upon that conviction, in matters of the *highest concern and importance* to his own interest."

In the case of *People v. Brannon*, 47 Cal., 96, the jury were told that it was their duty to convict if they should " be satisfied of the guilt of the defendant to such a moral certainty as would influence the minds of the jury in the *important affairs of life;*" and the Court say: " The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required. There must be in the minds of the jury an abiding conviction to a moral certainty, of the truth of the charge, derived from a comparison and consideration of the evidence. They must be entirely satisfied of the guilt of the accused."

This doctrine is strongly implied in Chief Justice Shaw's definition of a reasonable doubt, (*Commonwealth v. Webster*, 5 Cush., 320,) perhaps the most accurate that has ever been given: " It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge; a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it."

Human life is too sacred to be weighed in the coarse balances by which men adjust even the important affairs of life; scales which turn at the touch of a bare preponderance, by which the issues are determined, but which are not sensible to the finer elements of purpose and intent which lie hidden in act and deed.

Purpose and intent can only be shown by external conduct, which fallible man is too frequently unable to read aright, and only too willing to labor to make it read wrong; therefore, before he condemns, even though the scales may swing

far from an even poise, he must be able to say that he feels an abiding conviction to a moral certainty of the truth of the charge. The instruction under consideration, in our judgment, laid down a very different rule, and one which cannot be sustained either on principle or authority.

The facts of the homicide in this case may be briefly stated as follows: The deceased, John D. Massingal, a soldier, was on the evening of the 25th of December, 1876, in defendant's place of business, a saloon, in the town of Bismarck, with several of his comrades. After some talk in which the deceased spoke about fighting, but not directing his remarks to any particular individual, spoke of defendant's place as a fraud, etc., he and the defendant engaged in what appears to have been a mutual combat, in which the deceased pushed defendant to the wall and struck him several times over the head; the defendant finally got loose, went into the back room, and in a moment or two, as stated by one witness, returned with a revolver and shot the deceased while he was standing by the stove, firing three times, twice before he fell and once after he fell. At the second shot the deceased fell; and as he fell he exclaimed, "Oh! my God!" when the defendant said, "this is a damned pretty time to beg," and fired the third shot which took effect in the back. There is nothing in the record to show any former grudge or quarrel. There is some contradictory evidence as to the use of a slung shot, and as to deceased having kicked one of the female inmates of the house, and as to some threats made by deceased, which we do not consider necessary to notice.

Under this evidence the defendant asked the Court to instruct the jury as follows: "I charge you as a matter of law, that there was not sufficient cooling time between the first assault and the shooting, and that it was all one transaction, and must be taken together." We think the question is here fairly presented by the record, could this homicide be considered to amount to anything more than manslaughter? Or in other words, was it committed in the heat of passion, upon a sudden and sufficient provocation? and if so, was there time for the blood to cool? Whether it was so committed was a question for the jury under proper instructions.

On the point of cooling time, as to whether it is a question of law for the court, or one of fact for the jury, the author-ites are in seeming conflict. Bishop, (2 Criminal Law, § 712,) says: "But though each case is to be decided by its circumstances, the question is one of law, whether in the particular circumstances, the blood has had suffi-cient cooling time." And in the section following, he says: "The doctrine, let it be repeated, is, that the ques-tion, 'what is a sufficient cooling time?' and the question of 'what is a sufficient provocation?' are both of law, not of fact," and citing in support of the doctrine, numerous English and American cases. And Wharton, (Crim. Law, § 984,) uses this language: "Under such provocations as these, it has been said that whether the blood had time to cool or not, is a question for the court, and not for the jury," citing *State v. Sizemore*, 7 Jones, (N. C.) 206. No precise or definite rule can be laid down as to the time within which the blood should cool. Each case must be governed by its own circumstances; the character and temperament of the man; the nature and degree of the provocation, etc.; but if we should adopt the rule that it is a question of law for the Court, and the Court's at-tention having been directed to the point, he should have charged the jury thereon; if he thought there had been suffi-cient cooling time, he should have told the jury so. But we are of the opinion that the Judge who tried the cause below would scarcely have been willing to assume the responsibility of telling the jury that blows were not a sufficient provocation, if they found the fatal shot was fired in a passion engendered thereby, or that two or three moments were a sufficient time in which the blood might cool. That the homicide was per-petrated with a deadly weapon, does not, *ex necessitati*, swell the homicide to the degree of murder. While our statute de-fines homicide to be manslaughter when perpetrated without a design to effect death, still, if it was perpetrated in the heat of passion, engendered by a sudden and sufficient provoca-tion, even though the defendant at the instant, and in his frenzy, intended to take life, the law, in its tender regard for human frailties, will interpose and say there was no intent,

no premeditated design such as is essential to constitute murder. On this point the judge's charge is as silent as the grave. No reference is made even to the distinction between murder and manslaughter, further than to read to the jury from the statutes. We think on a point so vital to the rights of the defendant, the Judge should not have contented himself with merely submitting to the jury the provisions of the Penal Code without note or comment. It is undoubtedly the duty of the Judge to give full instructions to the jury, covering the entire law of the case, as respects all the facts proved, or claimed by the respective counsel to be proved. Still, if he omits something, and is not asked to supply the defect, the party who remained silent cannot complain. But in this case, as the record discloses, the attention of the court was called to the direct point, and he was asked to rule upon it. And in a case of such momentous importance to the accused, where his life (for which a man will give all he has) hung trembling in the balances; where the evidence showed a sudden combat, (passion,) with so brief a time intervening until the fatal shot was fired; we cannot understand how the Judge, even without being requested, could pass the question by. Had the Judge, being on the ground, and seeing all the witnesses, and hearing all the evidence, decided there was not sufficient provocation, or that there had been sufficient cooling time; or had the question been left fairly to the jury under proper instructions, we might hesitate before disturbing the solemn judgment of death. But under all the facts disclosed by this record, we are of the opinion, and such is the judgment of this Court, that the judgment of the Court below must be reversed, and the cause remanded for a new trial.

SHANNON, C. J., concurring.

BARNES, J., concurs on question of sufficiency of the indictment, but dissents on the other points.